# THE OCEAN BEACH ASSOCIATION

*v.*

# HENRY H. YARD.

1. In 1701 the board of proprietors of the eastern division of New Jersey issued a patent which is called the West patent, in which a portion at least of the lands therein intended to be conveyed were described by metes and bounds, being sixteen chains in width north and south, and sixty-four chains in length east and west, containing ninety acres, and including two sedge banks lying opposite thereto in Shark river. In 1800 one Wardell executed and delivered a deed to one White for a tract of land bounded by Shark river on the north and the Atlantic ocean on the east, with other and further descriptions including the said ninety acres. The eastern boundary of the said ninety acres, as surveyed, did not include all the land to the ocean, whatever may have been intended by the grantors and grantees in the use of the words at the mouth of the Shark and on the Atlantic ocean. In 1879 the defendant surveyed and took up from the board of proprietors a portion of the land which was not included in the said survey of the ninety acres, and claims title thereto. The complainant shows an adverse possession by itself, and those under whom

it holds, ever since the execution of the said Wardell deed. Under the circumstances of the case upon a bill to quiet title—*Held*, that equity will protect the complainant against the claim of the defendant.

2. Although it is a fundamental rule that the actual beginning corner must control in locating original surveys, yet, when a survey is made upon paper, and not upon the ground, the intention of the parties making the survey should control, which intention is to be ascertained by all the facts and circumstances connected with the case.

*Mr. John H. Stewart*, *Mr. Cortlandt Parker* and *Mr. Barker Gummere*, for the complainant.

*Mr. Henry C. Pitney*, for the defendant.

BIRD, V. C.

The controversy in this case involves the title to portions of the land on which the seaside resort of Ocean Beach has been erected. The bill is filed under the act of March 2d, 1870, and the supplements thereto, which provide for quieting the title to lands. The complainant, who made the improvements and had the possession of the premises, alleges that the defendant, Henry H. Yard, sets up a title to certain portions of the land and claims some interest therein. The complainant claims the superior title.

The lands claimed by the complainant are bounded on the north by Shark river, upon the south by Three-Cornered pond, on the west by lands of other parties, and on the east by the Atlantic ocean. Nearly equi-distant between Shark river and Three-Cornered pond is another body of water, called Silver lake or West pond. The land claimed by the defendant I will speak of as being comprised of two different parcels, one lying north of West pond, adjoining the Atlantic ocean, and containing thirty-one and eight hundred and fifty-seven thousandths acres; the other lying south of West pond and north of Three-Cornered pond, and near to, although not bounded by, the waters of the Atlantic ocean, and contains eight and forty-eight hundredths acres.

I will consider the complainant's title by deed. It offers a general warranty deed from Joseph Wardell and wife to John

Lipett White, dated September 1st, 1800, in which is this description : " Bounded northerly by said Shark river and easterly by the sea" &c. This is followed by the will of said White, approved July 14th, 1831, in which he gave to his sons Richard and Peter all his lands and buildings, to be equally divided between them. Richard quit-claimed his interest by deed, executed by himself and wife, to his brother Peter, August 15th, 1874, in which appears this description :

" Beginning at a stone planted at the head of West's pond, being the southeast corner of Drummond's patent and the southwest corner of William West's patent, both granted in 1701; thence down West pond to the sea; thence along the sea to Shark river; thence down Shark river, the several courses thereof, to Drummond's patent; thence to the place of beginning."

It next offers a general warranty deed made by Peter White and wife to Joseph B. Yard (one of the members of the association), dated November 1st, 1872, in which the land therein conveyed is described as adjoining the southerly edge of Shark river, with the following among the courses :

"Thence (11) along the ocean north, twenty-two degrees and twenty minutes east, at low-water mark, forty chains more or less to the inlet of said river; thence along the southerly edge of said river and inlet, the several courses thereof, to the place of beginning."

Joseph B. Yard and wife conveyed the same lands to the association by deed dated May 26th, 1873. Before proceeding further, I desire to call attention to a troublesome fact, and that is, the great uncertainty of description, locations and quantities in the deeds which have been and will be referred to, and upon which the parties rely, and which the court must deal with in coming to a conclusion upon the merits of this case ; such for example :

"Beginning at the mouth of a small run that vents into a pond called Three-Cornered pond, and on the north side, and about ten chains from the northeast corner thereof, which pond lieth near the sea."

And such as " bounded on all sides by prior locations ; " and such as the constant changes which it is admitted have been

Ocean Beach Association *v.* Yard.

going on in the shore-line of the ocean and of the inlet of Shark river, and the disappearance of monuments referred to in ancient surveys and deeds. If these considerations are borne in mind, many of these difficulties will be apparent as we progress.

I now note two other descriptions, both referring to the same premises, to wit, one "Rec'd in the Surveyor-General's Office, at Perth Amboy, N. J., in Book O, page 207," and is bounded as follows, to wit:

"A neck of land of ye mouth of Shark River, on ye south side, lying in breadth south sixteen Chains & up ye River in a straight line sixty eight Chains in length, together with two sedge banks in ye river opposite thereunto, John Reid."

The other, "Deed with quit-rents, Proprietors of East New Jersey to William West, 1701, Rec'd in Book G of Deeds, page 351, Secretary of State's Office, at Trenton," and described as follows:

"All that tract or neck of land lying & being at ye mouth of Shark River in ye sd. County on ye south side thereof, being in breadth south sixteen chains, & up ye river on a straight line sixty eight *chainss* in length, together with two sedge banks in ye river opposite thereunto, containing in ye whole *ninetie* acres. Together with all & all manner of rivers, rivulets, springs, runs, streams, dams, waters, water-courses, water-falls, ponds, pauls, pitts, trees, woods, underwoods, marshes, meadows."

And executed as follows, to wit:

"In witness whereof *wee* have caused the common seale of our said Province to be hereunto affixed & ye same to be signed by our Governor of our sd. Province & ye major part of his *councill* for ye time being, this 28th day of August, in ye 13th year of ye Reign of our Sovereign Lord William ye third, by ye grace of God, King of England, Scotland, France & Ireland &c. Annoque Dom. 1701."

The first of these speaks of a *neck* of land at the *mouth* of Shark river, and the next one of a tract of land at the *mouth* of Shark river. These phrases show that the parties used and understood the word *neck* in a different sense from that of *mouth*. But the manner in which they are used shows that they had an immediate and positive physical connection. They as conclus-

ively show an intention to include and convey all the land lying between the last line of the survey and the ocean, as they do all the land between the north line of the survey, which is a straight line, and the line of Shark river, which is a very irregular line.

. It will be seen that in the first description reference is made to a neck of land by the mouth of Shark river breadth south sixteen chains, and up the river in a straight line where the shoreline of the river now is, and I believe that in the discussion it was conceded that it always has been very irregular. And the sedge banks referred to have no other certainty connected with them except that they are opposite.

Plainly enough, if the tract of land thus surveyed did not include all of the lands south of Shark river to the Atlantic ocean, it must have been in that immediate neighborhood, and this the defendant admits, and says that the " mouth of Shark river," and the " inlet to Shark river," and " on the Atlantic ocean," are terms which were used for the purpose of ascertaining the location of objects generally, and not as monuments determining with certainty the exact boundaries of any given parcel of land. In his view the mouth of Shark river and the inlet to Shark river are convertible terms, and the dimensions or capacity or extent of them cannot be ascertained—that is, whether the inlet begins and ends at the extension of the shoreline of the ocean across the place where the waters of the ocean begin to flow into the river, or whether it extends from that place westward several yards or several hundred yards. I think if this should be admitted to be a troublesome uncertainty, it affords no advantage to the defendant.

But one fact is beyond dispute, whatever land was included in the West patent by an understanding between the parties, the parcel actually surveyed to him did not include the premises now claimed by Yard. This fact of course does not settle the location of the shore-line in 1701, the date of the West patent. That I am right in saying that the West patent does not include the Yard survey, is most clearly established by the location of a patent called the Drummond patent, which was surveyed

in 1701 also, and which is located directly west of the West patent, and has its beginning corner at the southwest corner of the West patent. I am to determine, therefore, whether the West survey or patent was located with reference to the Atlantic ocean so that the parties intended to include therein all the land to the shore-line, as it is admitted they did all the land between the straight line referred to in the patent and the shore-line of Shark river, as well as the sedge bank. If the West patent be located with reference to the Drummond patent, as it is conceded it must be, it will not reach eastward to the Atlantic ocean by the space occupied by the Yard tract, nor will it include a large parcel of land on the north between the straight line and the shore-line of the river. As I have said, this land next to the river, although conceded to pass by the grant, cannot be brought within the survey making straight lines, and is not mentioned in the grant in any other respect than that the land is located on the mouth of Shark river and on the south side of the river, nor is the land to the east of the straight line annexed to the Atlantic ocean in any manner referred to, except that it was at the mouth of Shark river and at the south side thereof.

As will hereafter appear, the contention on the part of the defendant is, that in all surveys of land made by the board of proprietors, that which was actually surveyed, located and returned, is all that can pass; and that this must prevail over the intention of the parties and must control every other consideration. To what extent this principle, so fundamental, may apply to other branches of the case, the defendant, who invokes its protection, does not press its application here. Indeed, it would seem to be extremely difficult, upon any equitable principles whatever, to give it efficacy and thereby deprive those who claim under the West patent of the land lying north of a straight line on the north side of the West patent and south of Shark river.

And it seems to me that the equitable considerations which give this land to the complainant lose none of their force when applied to the land lying to the east side and next to the Atlantic ocean. For taking into consideration the character of the prem—

ises to the east, its shifting sands, subject not only to the wash of the ocean, but to being removed thereby, the owners of the West patent have always had the same possession or dominion and control to the shore of the ocean that they had to the shore of the river. The lands adjoining the river were always fenced, and so brought under the possession and dominion of West and his grantees and devisees; and where the cross fences were, bars or gates were used, and persons desiring to gain access to the ocean passed through them, subject to the will of the owners of the West patent.

Before proceeding to show more particularly the nature of the dominion or possession of this land by those who claim under the West patent, it is proper to call attention to an ancient map which is in evidence, which was found by Peter White, one of the executors of John Lipett White, among the papers of the latter in the year 1831, in whose possession it has been ever since, and who saw it frequently in the lifetime of his father, the said John. Peter says he saw his father make use of this map in the year 1808, when he sold a portion of the land therein described. This map purports to have been made from an ancient survey by one Anthony Dennis, a deputy surveyor of the board of proprietors of East Jersey, and who surveyed a part of the land shown on this map in 1773.

In 1801 Joseph Wardell conveyed to John L. White and described the tract as follows: "Bounded northerly by Shark river, easterly by the sea." When, in 1837, Peter White gave a mortgage to Robert Shafto, a similar description was used. These considerations give some show of title and of right to exercise dominion and to enjoy the possession, the extent of which I will now endeavor to set forth. Peter White was born on the premises and spent the great portion of his life there. His father John purchased the land in 1800 and occupied it until 1831, when he died. Peter says that his father claimed and had the actual possession of this land down to the sea as long as he could remember, using it as pasture land, and that he gathered up all the drift-wood cast up by the sea thereon, and sea weed, which he used for manure. Peter was in possession

·of this portion of the tract and was farming it at the time of his father's death, and being one of the devisees under his father's will, he afterwards, by deed of mutual release with his brother, became the owner thereof.  He not only claimed and occupied the entire tract down to the sea, wherever the shore-line thereof might be, but had the actual possession thereof, and never heard ·of any one making any claim against him.  He claimed all the land from West pond up to Shark river inlet, which inlet would ·change as much as a hundred yards in one year.  Jeremiah Newman, who had been acquainted with Peter White's land for ·forty years, and lived in the immediate neighborhood, always understood that the White tract extended to the sea, and never heard of any unsurveyed land along the beach at that time. ·Clark Newman, born in 1821, and well acquainted in that locality, says that "by general reputation the eastern boundary ·of that land was the waters of the Atlantic ocean;" "all the ·other people along the shore conceded that Peter White owned the shore."

The evidence shows clearly many acts of adverse possession entirely consistent with the character of the land as against everybody but the Whites and their grantees.  These acts of ·dominion seem to me most clearly to bring this case within the principle declared to be established in the case of *Foulke* v. *Bond,* *12 Vr. 527, 548.*  Referring to the English authorities, the ·court in that case uses this language: "In a recent case before the house of lords, the plaintiffs claimed title to the foreshore lying between the high and low-water mark of the Clyde, a ·tidal, navigable river, in front of their upland.  The foreshore ·contained seven hundred and fifty acres, and extended about five miles along one side of the river, and about two miles along the other, and was entirely unenclosed.  The titles for the baronies ·contained no express grant of the foreshore, and did not specify the boundaries either of the baronies or of the component parts thereof.  The plaintiffs founded their claim of title on the .ground that, coupled with their title, they had exercised, from time immemorial, acts of possession over the foreshore.  The .acts of possession relied on were the pasturing of cattle on the

sea greens, a regular cutting of reeds and sea weeds, taking sand and stones for building purposes, and generally using, and permitting to be used, the lands in controversy for all the purposes for which land of that description could be used. It was held that such acts of possession for the prescriptive period gave a right of property in the foreshore." In delivering his judgment, Lord Blackburn uses this language with respect to the effect of acts of possession as evidence of an adverse holding, where the controversy involves the title to an unenclosed tract of considerable dimensions: "Every act shown to have been done on any part of that tract by the barons or their agents, which was not lawful unless the barons were owners of the spot on which it was done, is evidence that they were in possession as owners of that spot on which it was done; no one such act is conclusive, and the weight of each act as evidence depends on the circumstances; one very important circumstance as to the weight being, whether the act was such and so done that those who were interested in disputing the ownership would be aware of it; and all that tends to prove ownership of the whole tract, provided there is such a common character of locality as would raise a reasonable inference that if the barons possessed one part as owners they possessed the whole, the weight depends on the nature of the tract, what kind of possession could be had of it, and what the kind of possession proved was." *Lord-Advocate* v. *Lord Blantyre, 4 App. Cas. 770, 791.* Other cases are cited and quoted from in support of these same views.

I am convinced that it was the intention of the parties to the original grant or patent to secure to the patentee all the lands lying south of Shark river and west of the Atlantic ocean. This view is strengthened by the fact that Joseph Wardell and wife executed and delivered a deed to White for all of the said lands, expressly naming the river and ocean as boundaries so long ago as in the year 1801. There is nothing to show but that this transaction was an honest one. Thereby the grantee had such color of title as would secure to him and his grantees the benefit of an actual, open, continued and hostile possession for the period required by law. In this case I think the evi--

dence is most conclusive that there was and has been such possession for more than three-quarters of a century. Such title and such possession remained unassailed and unquestioned. After a most careful research, I have been unable to find any case where a claim of title has been supported by such testimony extending over a greater period of time.

Some effort was made to break the force or value of this adverse possession by showing that the fishermen built a fish-house upon a portion of the bluff next to the sea, and occupied it during certain portions of the year. This I cannot think is entitled to any consideration. The occupancy was not constant, but at irregular intervals. And if it should be regarded as of moment, it can only have application to so much land as the fish-house actually covered. I do not think the owner of land would lose his title thereto by permitting his neighbors or others to fish in navigable waters opposite thereto, or to erect bush-houses or cabins thereon for hunting or other purposes, at irregular intervals. *Wheeler* v. *Winn, 53 Pa. St. 122 (91 Am. Dec. 186)*; *Fletcher* v. *Fuller, 120 U. S. 534, 547, 551* and *553*; *Casey's Lessee* v. *Inloes, 1 Gill 430 (39 Am. Dec. 658)*.

Such is the character or strength of the title under which the complainant claims and enjoys its possession. In this claim and in this possession the complainant and its grantors or predecessors held unquestioned enjoyment until the year 1879.

In the years 1879 and 1880 the defendant procured proprietary rights to locate land, under and by virtue of which he claims that he had a right to locate and take up the two parcels of land to which he now asserts a superior title, because at that time they had not been taken up or located by any one.

I will now proceed to consider the rights of the parties with respect to the parcel south of West pond, which contains eight and forty-eight hundredths acres. It had so transpired that at the hearing it was admitted that the only question between the parties was with respect to the title to so much of the land within the boundaries of the said eight and forty-eight hundredths acres as is included in the various spaces covered by the intersection of Atlantic avenue and the streets crossing said avenue. The ques-

tion is, whether these small spaces are included in the survey and take-up of the one hundred and eighty-three and twenty-five hundredths acre tract, under which complainant claims, as well as in the survey and take-up of the defendant.

The greater difficulty has been in arriving at a satisfactory conclusion with respect to the rights of the parties in the tract just referred to. The objections by the defendant to the position taken by the complainant are of great force. Upon the whole view of the case, however, the complainant seems to be entitled to a decree.

As appears from what has been said respecting the first parcel of land, such parcel lies south of Shark river and north of Silver lake or West pond, and adjoining the Atlantic ocean. The land, the title to which is now being considered, lies south of West pond and north of Three-Cornered pond. Between these two ponds are several tracts or parcels. The titles to these tracts were at various times taken from proprietors of East Jersey; the northernmost one, which adjoins the West pond, contains fifty-eight and nineteen hundredths acres, and was surveyed and returned February 29th, 1760. The next immediately south contains six and thirty-seven hundredths acres, and was surveyed and returned April 2d, 1821. The one next south contains fifty and thirteen hundredths acres, and was surveyed and returned May 6th, 1820. The one next south contains twenty-one and twelve hundredths acres, and was surveyed March 31st, 1821. The next south contains thirty acres, and was surveyed May 24th, 1794. The next south is two hundred and seventeen and eighty-five hundredths acres, and was surveyed March 20th, 1760. And the next, adjoining Three-Cornered pond and being a portion of the tract the exact location of which is the subject-matter of dispute between the parties, contains one hundred and eighty-three and twenty-five hundredths acres, and was surveyed December 2d, 1861.

This last-named tract not only extends along Three-Cornered pond south of the other tract before named, but also east of all said tracts and between them and the ocean on the east. But still east of the last-named tract is another tract, taken up by

Corlies, containing thirty-four and seventy-six hundredths acres, spoken of as the Corlies tract, which the complainant claims lies immediately adjoining the east line of the one hundred and eighty-three and twenty-five hundredths acre tract. The complainant alleges that the one hundred and eighty-three and twenty-five hundredths acre tract is located about three chains nearer the ocean than the defendant admits. The defendant insists that its beginning corner is the termination of the line in the sixth course, which is the northeast corner of the first tract, such lines located south of West pond containing fifty-eight and nineteen hundredths acres, while the complainant insists that, notwithstanding the call in the survey and return is for such northeast corner, it was in fact located about three chains farther east. Whilst the six tracts above named lie south of West pond, in the order given, and west of the land, the location of which is in dispute, their north and south lines are not coterminous either on the east or west sides thereof, except, perhaps, the easterly lines of the second and third tracts; for example, the easterly lines of these two tracts are about three chains further east and nearer the ocean than the first tract to the north thereof, the northeast corner of which the defendant claims; the east lines of the other tracts are nearer the ocean than the east line of the second and third tracts.

It is important to bear in mind that the east lines of the second and third tracts are in reality further east than the east line of the first or fifty-eight and nineteen hundredths acre tract by about three chains, and also that if the east lines of the second and third tracts were to be extended as far to the northeast as the east line of the first or fifty-eight and nineteen hundredths acre tract, the said lines would be nearly parallel to each other.

In 1851 or 1852, Ananiah Gifford, a deputy surveyor, surveyed the tract of land lying east of all the tracts above enumerated. There seems to be no dispute as to the exact location of this survey. He seems to have surveyed it for the purpose of enabling Edward Brinley to make title thereto to a number of men engaged in fishing, but the title to them was not completed until in December, 1861, although they took possession

of it soon after the survey, and had possession until they acquired the title in fee by deed.   The part of this survey being so plainly understood, and the persons for whose benefit it was intended having taken possession, and having had the possession so long, they became familiar with its actual boundaries according to the survey.   This survey was made by beginning at the southeast corner of the third tract above named, running thence north-easterly, along the eastern boundary of the third and second tracts, to a point nearly east of the northeast corner of the first or fifty-eight and nineteen hundredths acre tract, but nearly three chains distant therefrom.   I am very much inclined to believe that the surveyor, although familiar with the several tracts of land named, believed that that line, as extended beyond the third and second tracts, was upon the east line of the first or fifty-eight and nineteen hundredths acre tract.   This first course is north, thirty degrees east, twenty-eight chains and eighty links; the second course is north, thirty-five degrees fifteen minutes east, twenty-three chains; the third course is south, forty-seven degrees east, ten chains; the fourth course is south, twenty-one degrees forty-five minutes west, sixty-four chains and thirty links.   These distances are considerable.   They would be readily recognized and remembered by all persons interested and acquainted with the locality.

In 1861, and before the conveyance by Brinley to Brown and others, the said Brinley surveyed and took up a larger tract, known in this controversy as the one hundred and eighty-three and twenty-five hundredths acre tract.   This tract was supposed to include the ninety-one and ninety-six hundredths acre tract last above referred to.   Of this I can have no reasonable doubt.   And if the survey and take-up of the one hundred and eighty-three and twenty-five hundredths acre tract did actually cover and include the ninety-one and ninety-six hundredths acre tract, there can be no defence to this suit, and the complainant is entitled to a decree. The expert witnesses of the defendant and the defendant's counsel all admit this.   The beginning point in the survey of the one hundred and eighty-three and twenty-five hundredths acre tract is not the beginning corner of the ninety-one and ninety-six hun-

-dredths acre tract.  The real question is, whether such beginning point is at the termination of the first line of the ninety-one and ninety-six hundredths acres, or about three chains further to the west at the actual termination of the sixth line, or the northeast ·corner of the fifty-eight and nineteen hundredths acre tract.  If the beginning point be at the said northeast corner, then of course it will locate the one hundred and eighty-three and twenty-five hundredths acre tract about three chains further to the west, and will secure to the defendant the take-up where he claims he has ·title to.

It is to be observed that when Brinley, the surveyor, made his -survey and return, and took up the one hundred and eighty-three and twenty-five hundredths acre tract, he did not make an ·actual survey thereof upon the ground.  He, however, made a map representing both the one hundred and eighty-three and twenty-five hundredths acre tract and the ninety-one and ninety-six hundredths acre tract, and all of the other tracts, from one to eight, to which I have above referred.  This map was discovered amongst his private papers by his widow after his death, and has been offered in evidence.  This map represents the easterly lines of the three first tracts of land above named, the first one being the fifty-eight and nineteen hundredths acre tract, as being bound by one continuous line upon the east, which, as above named, does not truly represent the location and relation of said parcels to each other; but there is no dispute but there was about five and eighty-nine hundredths acres of land between the easterly line of the fifty-eight and nineteen hundredths and the westerly line of the ninety-one and ninety-six hundredths acre tracts, as surveyed.  These five and eighty-nine hundredths acres were surveyed and taken up by the complainant in this case.  What was in Brinley's mind when he made this survey upon paper in 1861 is conjecture to some extent.  In making his map it may be, as the defendant insists, that he moved back to the westward all the ·other parcels of land lying south of the fifty-eight and nineteen hundredths acre tract, so that the easterly lines of the second ·and third tracts were but a continuation of the easterly line of the first tract; or it may be that instead of his supposing such to

be the real condition, he had moved the fifty-eight and nineteen hundredths acre tract further to the eastward, so that its easterly line should be a continuation of the line of the third and second tracts. If their lines were so located in the mind of Brinley as last suggested, the contention of the complainant, as to the true location of the one hundred and eighty-three and twenty-five hundredths acre tract, would be vindicated.

But another view of the case is developed by the testimony, and this has no light impression upon my mind. It is said that the owner and occupant of the fifty-eight and nineteen hundredths acre tract extended his occupancy beyond the eastern boundary, so as to include the land between such true eastern boundary and the west boundary of the ninety-one and ninety-six hundredths acre tract. In addition to this, one or more of those who agreed with Brinley to take the title to the ninety-one and ninety-six hundredths acre tract after it was actually surveyed, and long before they got their deed, took and held possession, and for the purpose of pasturing their cattle, fenced it. The weight of testimony shows that they constructed their fence or enclosure about along the actual line of the ninety-one and ninety-six hundredths acre tract, which, it will be perceived, is about three chains distant from the easterly line of the fifty-eight and nineteen hundredths acre tract. I think it is fair to presume that Brinley, the deputy surveyor, was cognizant of these facts. He certainly knew the lines first surveyed, as made by Gifford about the year 1851; from that time on, or soon after, these fishermen possessed and occupied this land under an agreement with Brinley to purchase.

In 1861, as stated, he made survey of the one hundred and eighty-three and twenty-five hundredths acre tract. To my mind it is not reasonable to suppose that he intended, or thought he actually did, in his paper survey, make any other point a beginning corner than the termination of the first line of the ninety-one and ninety-six hundredths acre tract or northwest corner of that tract. It does not seem reasonable to me that he would have begun about three chains further west for the purpose of including a small parcel of land, when by so doing he would exclude from the eastern side of his survey a parcel equal in width and

Ocean Beach Association *v.* Yard.

about twice the extent in length.  This seems to be especially so if it be true that the owner and occupant of the fifty-eight and nineteen hundredths acre tract had the actual occupancy of the five and eighty-nine hundredths acres referred to.  But, again, I am influenced not a little by the consideration that Brinley had agreed to convey to these fishermen the ninety-one and ninety-six hundredths acre tract, and to carry out that agreement, and to enable himself to make a perfect title to them, was no doubt his object in taking up the one hundred and eighty-three and twenty-five hundredths acre tract.  This being so, I cannot reconcile my mind to the belief that he deliberately made a survey of the one hundred and eighty-three and twenty-five hundredths acre tract leaving out a considerable portion of that which he had agreed to convey, and which he actually afterwards undertook to convey to the fishermen.  When the proximity of the last survey and the execution of the deed are considered, this view of the case seems to be more deeply impressed upon the understanding. The actual location of the survey in 1851 was undoubtedly in his mind.  In the month of December, 1861, he made the survey of the one hundred and eighty-three and twenty-five hundredths acre tract.  In the month of December, ten days after the survey, he executed the conveyance for the ninety-one and ninety-six hundredths acre tract.  The covenant in his deed plainly indicates that he well understood the situation, and he understood it as did his grantees.  The covenant to which I refer is in these words:

"And the said Edward Brinley covenants and agrees that the above bargained premises have been duly located on a proprietary right of location of the eastern division of the State of New Jersey, and the said right of location he the said Edward Brinley will warrant and forever defend against the lawful claim and demand of all persons whomsoever."

These fishermen were all present, in 1870, when Francis Corlies made the survey of the thirty-four and forty-eight hundredths acre tract, which he supposed he was locating immediately adjoining, not only the ninety-one and ninety-six hundredths acre tract on the east, but also the one hundred and eighty-three and twenty-

five hundredths acre tract. They pointed out to him the corner of the ninety-one and ninety-six hundredths acre tract, which he also understood to be the corner of the one hundred and eighty-three and twenty-five hundredths acre tract, to which they had always claimed title.

Again, the map made by Brinley, above referred to, gives the boundaries not only of the one hundred and eighty-three and twenty-five hundredths acre tract, but also of the ninety-one and ninety-six hundredths acre tract. This map, while it represents the termination of the first line of the ninety-one and ninety-six hundredths acre tract as being at the same place as the beginning point of the one hundred and eighty-three and twenty-five hundredths acre tract, and also the northeast corner of the fifty-eight and nineteen hundredths acre tract, represents the east line of both the one hundred and eighty-three and twenty-five hundredths acre tract and the ninety-one and ninety-six hundredths acre tract as the same, and represents them both as terminating at the same point. By this, two important points are conclusively settled—first, that Brinley always understood that the first line of the ninety-one and ninety-six hundredths was located the same as the easterly line of the second and third tracts above referred to, and was extended to the northeast to a point which was located at the northeastern corner of the fifty-eight and nineteen hundredths acre tract, and which he also made the beginning corner of the one hundred and eighty-three and twenty-five hundredths acre tract; and secondly, that he intended the easterly boundary of the two tracts, so far as they together extended southwardly, to be the same.

It also appears satisfactorily to my mind that the grantees of Brinley not only occupied the ninety-one and ninety-six hundredths acre tract from the time they agreed to purchase, in 1852, until the deed for the same was delivered to them in 1861, but that when they received such deed, they understood and believed that the true location of the land described in such deed was in accordance with the survey made by Gifford in 1851; in other words, they understood and believed that the line actually taken up by Brinley in 1861, under and by virtue of which take-up

he was enabled to perform his agreement of sale to the fishermen, ·embraced all the land which he agreed to convey to them, and ·which, by the description in his deed, he undertook to convey.

Another fact is worthy of notice.  Upon the survey of the ninety-one and ninety-six hundredths acre tract there were five and ·eighty-nine hundredths acres of land lying between the first line thereof and the easterly line of the fifty-eight and nineteen hundredths acre tract not included in any survey.  This, as before stated, has since been taken up by the complainant.  It would not be fair to contend that Brinley knowingly included this in the survey of the one hundred and eighty-three and twenty-five hundredths acre tract, but did not include it in his conveyance of the ninety-one and ninety-six hundredths acre tract to the fishermen ; and in order to secure to them upon the face of his grant the ninety-one and ninety-six hundredths acres, the whole amount agreed to be conveyed, extended the boundary of the tract nearly three chains beyond the line of his survey and take-up.  There is nothing in the case to show that he intended to perpetrate a fraud upon the fishermen.

With these facts in mind, what, under the law, should be the judgment of the court?  In locating a survey, the law requires the court to observe faithfully the beginning corner, wherever it may be.  The question is not, where did the parties intend to plant the beginning corner, but where did they actually plant it.  But in case the parties were not upon the ground and did not make an actual survey of the premises, then to ascertain the true beginning corner the intention of the parties must necessarily be resorted to ; and by this means the actual location may be fixed with more or less certainty.  Such intention may be ascertained by what the parties said and did at the time when they undertook to locate the survey.  In this case, while it is of great importance, as is insisted by the defendant's counsel, that the map produced by the complainant represents the beginning corner of the one hundred and eighty-three and twenty-five hundredths acre tract as being the same as the northeast corner of the fifty-eight and nineteen hundredths acre tract, yet the many other facts above referred to show to my mind very conclusively that

he supposed the actual northeast corner of the fifty-eight and nineteen hundredths acre tract was at the same point where the first line of the ninety-one and ninety-six hundredths acre tract terminated, or about three chains further to the east than it actually was.

It is proper I should add that I have endeavored to settle the rights of the parties upon the real merits of the case as developed in the testimony, and without reference to any technical objections presented by the complainant against the standing of the defendant. It was urged that the defendant failed to give notice to the adjoining landowners of his intention to make a survey and take-up of the land which he now claims; and it was also urged that he, having been a prominent and active member of the complainant association, and having made one or more maps including the land the title to which is in dispute, and having actively assisted for a year in making sales of different parcels of these lands, is in equity estopped from claiming any right or title thereto as against his former associates, although at the time of making his survey and take-up he had ceased to be a member of the association. I have not found it necessary to discuss the merits of these objections.

It is also proper I should state, that in the foregoing presentation of facts I have alluded only to those which seemed to me to be most prominent and controlling. When it is observed that the testimony covers over twenty-nine hundred pages, and that counsel consumed more than twelve days in the discussion of the facts, it will at once be noticed that many matters more or less material have necessarily not been adverted to.

I think the complainant is entitled to a decree according to the prayer of its bill, with costs.